Good morning, Your Honors. My name is David Miller. I'm the attorney on behalf of Ms. Manjeet Kaur. We're here today to talk about two things I think are primary in this particular case. First of all, I'll introduce the issues, one being the severance at trial and two being the jury instruction that was handed down regarding reasonable cause to the legal counsel. First of all, Your Honor, I'd like to incorporate my briefing to the record and also point out to the court, in case the court did not get my notice, that there is a case out there that is related to this case. It is cause number 0-3. You've got to talk a little louder. I apologize. There is a case that is related to this case, Your Honors. It is case number 0-3-3-0-5-7-9, United States of America v. Joga Singh Johal, J-O-H-A-L. I have provided the court with notice of this in writing. However, I'm not sure if you have that or not before you. The National Association of Criminal Defense Lawyers has filed a brief on behalf of Mr. Johal in that particular case. I believe the issues are related very closely to this case, as he was basically a co-defendant in these cases, one of the 15 that was arrested. So I believe that the court should perhaps consider that brief and relate it to these issues that I provided to the court. Not that I'm trying to minimize my brief, but I think it's important for the court to have all the facts before it. Well, but it's not like a controlling decision. You're just asking us to look at another case that's pending? It's pending, Your Honors. Yes, that's correct. I know that their attorney, Sheryl Gordon McLeod, is obviously concerned about this court making a decision on my case that might affect her case. She is Mr. Johal's attorney, and we've had discussions on this, and I think it's important to bring it up to the court. Okay. And why don't you write that cite down on a gum sheet and give it to the clerk? I also provided it in writing to the court. Do it. I will do it, Your Honor. I'd be happy to do that. You don't have a stack of papers like that. I bet you do. Here we have it. Moving on to the case, Your Honor. In this particular matter, Ms. Carr was before the Eastern District in Washington. Prior to trial, her and her attorney moved the court for an order of severance. They continued to bring up the matter of severance up, I think, into the point of trial and even throughout the trial, trying to get her case severed from the remainder. Her husband in this particular case, a Mr. Singh, scratched a little bit of the history in this. Ms. Carr came to this country. I believe she was a Sikh. And her and her then-husband purchased a convenience store in Spokane, Washington. They ran it for a good deal of time. Her husband then passed away from natural causes, and Ms. Carr continued on with the business by herself. She later married Mr. Singh, however, who was also a co-defendant in her case. However, prior to her being arrested and taken before the Eastern District, Mr. Singh was reported to have pointed a gun at her. There was some domestic violence involved in her marriage. And, in fact, Mr. Singh had moved out of their family residence and was living on his own. We believe that that is an important issue to bring up because it demonstrates that there is some animosity between some of the defendants that were lumped together before the court, and we believe that was improper. The court should also note that Ms. Carr, in fact, did not sell any of the pseudoephedrine to any of the confidential informants or any of the undercover agents. In fact, it was her husband-slash-employee who did the sale of this. In fact, she denied selling any of the cold medications to the confidential informant when the confidential informant came in to purchase said cold medications. Did she write a note on an envelope? There is an envelope that contained the letter from the, I guess, from Washington licensee informing them that they should be careful on the quantities of cold medications sold to a person. However, Ms. Carr denies ever reading it. She does state that she did see the note on the outside of the envelope, but the court should be aware that Ms. Carr does not speak English very well and certainly does not read English probably at all, and I think that was pointed out at trial. She's an immigrant, and she has a difficult time understanding the English language and certainly our culture. Also pointing out about her culture, I think it's important to note that as a married woman in the community that she was brought up in, that she was to do as told by her husband, and it's our contention that that is another reason why the case should have been severed because the husband in this case-slash-employee was telling individuals, first of all, that he owned part of the store, and second of all, he was the only one who had allowed someone to purchase large quantities of pseudoephedrine through that particular store. And I'll move on to the jury instructions, Your Honor, because I wanted to reserve some time to remain unless the court has any further questions about the severance. The defense wished to have a jury instruction that talked about looking through the lens of the person charged. I believe it was some of the language used in it. However, the government got through their jury instruction that talked about having reasonable ability to believe that the pseudoephedrine that was sold would be used to manufacture methamphetamine. But the government never demonstrated that, in fact, Ms. Carr knew what methamphetamine was or, two, how to manufacture it. In fact, the government had to put on its own expert to demonstrate to the jury on how to manufacture methamphetamine through this certain process that uses cold medications. The court should also remember there are no restrictions in the United States handed down by Congress or the courts as to how many packages of pseudoephedrine can be sold at any one time to any one person. There's no law out there. It's kind of a reasonable standard that puts forth. Now, to kind of reverse this, imagine for a moment, if you would, that the court, we move to India, and there is a certain product that is legal to sell there. It's perfectly legal to sell. But that product can be used to, say, manufacture something illegal, and we've never been exposed to that illegal product in our lives. And we don't know necessarily that selling a big. That's a jury argument, isn't it? It is, Your Honor. But it also goes to looking through the lens of the person charged, and I think that is what is important, respectfully, to Your Honor. You have to realize that the culture that this person was brought up in, she was trying to follow the rules. She was trying to follow the laws. She was trying to follow the laws of her culture and customs therein, and she was also trying to follow the laws of the United States. Again, there are no restrictions as to what you can sell to an individual. If you sold one pill to a person, one cold tablet pill, and you knew that that pill would be used to manufacture methamphetamine, you violated the law. You can sell a case of it, or you can sell one pill of it. It doesn't matter. If you know that it's going to be used to manufacture meth, that is where the government takes a stand and says you violated the law. Your Honor, it's our contention that the reasonable cause to believe standard used in this particular case gets rid of the mens rea, the evil intent, followed by the evil working hand. It totally gets rid of it. There's no knowledge demonstrated. It just says that the jury has to find that the person involved here had a reasonable cause to believe. That's all it says. And it's the defense position that, in fact, the defense's jury instruction should have been used, and obviously because it wasn't used, it was prejudicial to Ms. Carr. I know the Court's aware of this, but I want to point out again that guilt is a personal thing. You can't just lump someone's actions in with a group of others. In this particular case, Ms. Carr was lumped in with other individuals who had actually sold pseudoephedrine in large quantities to undercover agents and were caught doing so. She never did that act. She owned the store. The pseudoephedrine was kept behind the counter, and they say it was kept behind the counter because people would come in and steal it. It also points out that she had a difficult time doing her own ordering and paying her own bills, that, in fact, the people who were providing the store, the wholesalers, were, in fact, coming in and assisting these store owners, including Ms. Carr, with their orders and placing items on the shelves for them and basically writing a check and then having the store owner sign the check. That's how, I hate to use the word ignorant, but that's how ignorant these people were to even writing checks, the fact that they have an ability to work hard. The records demonstrate that these individuals worked 12, 13 hours a day, seven days a week. They're hardworking individuals. They weren't just trying to make a fast buck. Again, they were just trying to sell a legal product. The fact that they were selling in large quantities is not against the law. If I sell several cases of pseudoephedrine to someone thinking they're going to use that product to, say, they own a camp for children and they have lots of allergies and they need lots of these pills all at once, if I were to sell that to, say, the Girl Scouts of America, a case of pseudoephedrine, I haven't violated the law because they're going to use the pills legally. They're not going to break them down. I believe Staples v. U.S., a 1994 case, requires that statutes that don't have the knowledge pronged in them, actually the court needs to place that knowledge into the statutes unless the activity is inherently dangerous. And selling cold medications is not an activity that is inherently dangerous. You covered all this in your brief. I believe I have, but I'll reserve the room. What about the misjoinder, the prejudice of the misjoinder? Pardon me, Your Honor. I did talk about the fact that there was some severance that should have taken place prior to the trial that didn't take place. Does the Court have any specific questions about that? Yeah. The problem that I have about the misjoinder favors your side. Here we have a woman who was marginally guilty, but we have joined with her, unrelated to her, no connection with her any way whatsoever, but out of the clear blue sky, here comes Asing. And Asing was a bad guy. He was so bad that in the middle of the trial, the evidence was so bad he pleads guilty. Correct. Psychologists tell us without any question that it's true that people in the majority group, which are Anglo, always say, when you see one, you see the others. That's a prejudice that happens when you have minority groups prescribing things. In Montana, when one guy is so bad that they associate all things in the same group. When you see one, you see them all. I agree. An example is that this morning when I apologize my plane was late. Alaska Airlines decided to cancel a flight this morning. When I was coming from the airport to the court this morning, I had a driver who was wearing a turban. Does that mean that he's a terrorist? No. But if I were having a jury trial and I had that gentleman sitting beside me and he was charged with a crime, would he be prejudiced because of his background? Probably. In this particular case, this woman was prejudiced because, again, she was lumped in with a large group of individuals who owned other stores, who had nothing to do with her, who didn't know her. Remember, there was really no conspiracy charged here. Merely they were saying that she. The only reason they put anything in there was the convenience of the government. This whole case was for. Another trial. This whole case was for the convenience of the government. I agree with your honor. Thank you. That's why a saying was put in with her. Everyone would have wouldn't have a separate trial. Your honor. Rest smooth for the United States. The beginning of this trial in this investigation, there was a number of defendants that were joined. There were 15. Tell me why. Why sing was joined with her. That was a decision made by the district court in order to come to have less than 15 trials, but more than one trial. Your honor. The reason why. Is there a possibility of evidence between those two? Obviously, I can see between BC and there was. Yes, your honor. In this case, there was the same confidential source that may control purchases from each store. Each defendant was involved in the case. The same investigating officers investigated the case. It's easy for the government to wrap up, wrap them all up at one time rather than have to have separate trial. Well, I think that there. I wonder why a was sent with her because he was so bad in this case. Why put her in with somebody that was fortunately bad. In this case, your honor, there was references made during the investigation by the defendants and the confidential source in recorded conversations. Referencing referencing another store operator named Jesse. In this case, a saying was known to the confidential source by the name of Jesse. These references made on recorded conversations to Balraj Singh, who was Ms. Manjit cowers, co-defendant were made in the course of negotiating or or trying to obtain the pseudo Ephedram from Mr. Balraj Singh and Ms. Tower. So there was cross references that the government believed that it was Jesse. It was a saying Amandeep Singh. Now, in the testimony. In fairness, your honor, in the testimony, Mr. Balraj Singh did indicate that he, in his view, Jesse was a different person. That came out in the testimony and whether or not that is accurate or not accurate would be within the jury's realm to determine. But at the time of the trial, there was not only a a overlap of evidence, but there was also a believed connection between Jesse and the other two defendants. And Jesse being a Singh or Amandeep Singh. What about Miss Tower? What about the woman with the connection? Yeah, your honor. The connection, your honor, then would be with Manjit cower would be connected as well through co-defendant to government's theory of the case. If the court will would be that both of these defendants operated Sunset Food Mart. Manjit cower being the owner of Sunset Food Mart. Both defendants were involved in the sale of pseudo Ephedra. And talking about you're talking about these things. Yes. Keep straight. Singh pled guilty, right? Yes, your honor. During the trial at the point in which the evidence is not reflected in the record, I believe. But it was at the point in which all of the evidence was in basically at the close of the government's case. Psychologists are right when they when they say that it is true that majority groups will give you minority groups. Believe that when you see one, you see them all. I don't know, your honor. What's your what's your off the cuff opinion? You've heard that expression many times. Sure. I, I think that some people would, in fact, fall into that category and others wouldn't. I think I think so, too. See, that's the problem in this case. You got a marginally guilty woman and extremely guilty man. And they both say they're both sheiks. Have a tendency to lump them all together. And that's that's the prejudice. We know that that we know that the that the law was not followed insofar as the consolidation is concerned. The joiner. They should never have been joined in the first place. And the question becomes whether or not it was prejudicial. In this case, your honor, I would believe that as this court, this court has indicated that prejudice in the cases of Miss Joiner, then prejudice can be avoided by compartmentalizing the case as well as properly instructing the jury. But psychologists say you can't compartmentalize. You can't do that when you have minority groups. They're all lumped together. I would I would suggest, your honor, that the outcome of this case, especially concerning Ms. Cower and Mr. Balraj saying the codefendant having different results from the jury would. I would submit that the results in this case did show that the jury was able to compartmentalize evidence between defendants. You concede error on a thing. No, your honor. I argue if if if Miss Joiner was in error, your honor, then that then the district court's instructions. Right. I'm asking you. I mean, obviously, if you conceded if you concede. The Joiner issue, then you go to the harmless error or the prejudice would not concede error, your honor. I believe that there was enough of overlapping evidence prior Ninth Circuit cases. Overlap is they were part of the same sting. So the agent was the same. That makes the buys with Beeson and Asing. Right. And there was a reference to Beeson getting in the trial. There was a reference of conversations of Beeson with someone named Jesse. It was it was a it was a conversation between Beeson and the confidential informant that was negotiating the transaction concerning another individual, a an Indian individual convenience store operator known as Jesse. In this case, the evidence was there that Asing was Jesse. The in the that was how Asing was known to the confidential source as Jesse. She I believe I do not have a record site on this, but in the in the record, I believe that there was testimony to the fact that Asing, who was who was involved in the trial, was identified as being known as Jesse to the confidential source. All right. When Asing just disappears from the case, are there instructions given to the jury by the court regarding Asing being gone? I believe that the that the jury was instructed that Asing was no longer a part of the case other than the specific wording, other than being no longer part of the case. I don't want to speculate as to other words that were said, but I would indicate that the jury instructions at the close of trial were that the jury was to weigh the evidence against each defendant separately without regard to the other defendants, was to weigh the evidence about each count separately without regard to the other counts. So they could never, never be prejudiced if that was given. Is that what you're saying? If that instruction is given, there could never be prejudice when there's an invalid misjoinder. I think that the law recognizes that the that the jury is presumed to be able to compartmentalize the case. That is my question. My question is, there could never be a prejudice, even though there's an illegal misjoinder, as long as that instruction is given. Is that your position? I believe that curative instructions can can cure against potential prejudice. But then you've got minorities. People say they only see one. You see them all. So you cannot. Which conflicts with the instruction. Again, possibly I would concede that some people would feel that way. I would also highlight the fact that that was not the case in in the verdict against Ms. Cowher and Mr. Singh B. Singh. Well, Your Honor, I know that the jury instruction seemed to be was of issue. I would just like to clarify a number of things. First, Your Honor, the defendant or counsel for the appellant. Your Honor can express some concern about the mens rea element of reasonable cause to believe. And I would suggest, Your Honor, that the in terms of the brief before the court, what was raised on argument was was narrowly defined as to whether or not the court fashioned jury instructions, specifically defining reasonable cause to believe established a reasonable person standard, not whether or not there is or isn't a subjective element in the statute. Thank you, Your Honor. Anything else? No, Your Honor. Thank you. Thank you very much. And the matter will stand submitted and the court will recess. All right. For this. You want me to submit that?
judges: Pregerson, Ferguson, Callahan